UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PHILANA SHIELDS,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )        No.  4:18 CV 807 CDP
                                    )
ANDREW M. SAUL, Commissioner        )
of Social Security,[1]              )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

Plaintiff Philana Shields brings this action under 42 U.S.C. §§ 405 and 1383

seeking judicial review of the Commissioner's final decision denying her claims for

disability insurance benefits (DIB) under Title II of the Social Security Act, 42

U.S.C. §§ 401, *et seq.*, and for supplemental security income (SSI) under Title XVI

of the Act, 42 U.S.C. §§ 1381, *et seq.*  Because the Commissioner's final decision is

not supported by substantial evidence on the record as a whole, I will reverse the

decision and remand the matter to the Commissioner for further proceedings.

### Procedural History

On May 18, 2015, the Social Security Administration denied Shields' October

---

[1]  On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security.  Pursuant to
Fed. R. Civ. P. 25(d), Saul is substituted for Deputy Commissioner Nancy A. Berryhill as
defendant in this action.

2014 applications for DIB and SSI, in which she claimed she became disabled on September 1, 2013, because of pace maker, asthma, spinal arthritis, cervical cancer, numbness in arms and hands, depression, dizziness/passing out, and anemia.[2] A hearing was held before an administrative law judge (ALJ) on May 24, 2017, at which Shields and a vocational expert testified. On August 11, 2017, the ALJ denied Shields' claims for benefits, finding the vocational expert's testimony to support a finding that Shields could perform work that exists in significant numbers in the national economy. On May 7, 2018, the Appeals Council denied Shields' request for review of the ALJ's decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Shields claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ improperly evaluated the opinion evidence of record regarding her mental impairments and improperly engaged in her own medical conjecture in reviewing this evidence. Shields asks that I reverse the ALJ's decision and either award benefits or remand for further proceedings.

For the reasons that follow, I will remand the matter to the Commissioner for further proceedings.

---

[2] In the written decision denying these applications, the administrative law judge (ALJ) referred to earlier applications filed by Shields that were denied by an ALJ on February 28, 2014, and not pursued further. (Tr. 19.) Shields does not challenge the ALJ's decision here to not reopen those applications. Accordingly, the issue before the ALJ on the present applications was whether Shields was disabled at any time after February 28, 2014. (*See id.*)

## Medical Records and Other Evidence Before the ALJ

In September 2012, Shields filed applications for DIB and SSI alleging that she became disabled in June 2012 because of asthma, third-degree heart block, headaches, and cervical pain and leg pain resulting from a motor vehicle accident. After a hearing, an ALJ denied Shields' claims for benefits on February 28, 2014, and Shields did not pursue the claims further. In October 2014, Shields filed new applications for DIB and SSI, claiming disability as of September 2013 because of, *inter alia*, cervical cancer and depression.

Shields underwent a radical hysterectomy in February 2015 to treat her cervical cancer. At a follow up appointment after surgery, Shields complained of having urinary problems, and examination showed that her bladder was backfilled. She could not void. She was later diagnosed with neurogenic bladder, resulting in her having to self-catheterize every six hours. Shields understood that this was a life-long condition. This situation, as well as her cancer diagnosis and treatment, exacerbated Shields' symptoms of depression – *e.g.*, poor sleep, feelings of helplessness and hopelessness, thoughts of death, and crying spells – for which she sought and began receiving regular psychiatric treatment in May 2015. In June 2015, she began reporting that she heard unidentified voices calling her name. In December 2015, she began reporting that, in addition to the ongoing auditory hallucinations, she saw persons or shadows walking around her house. She also felt

that someone else's thoughts were in her head. She was diagnosed with schizophrenia at that time, and her medication regimen was changed to treat the impairment.

Throughout 2016 and into 2017, Shields continued to have auditory and visual hallucinations, and her mental health care providers noted no improvement with medication. In May 2017, Shields was authorized to receive community support services from the Community Psychiatric and Rehabilitation Center because of her persistent and severe mental illness.

The ALJ denied Shields' applications for benefits on August 11, 2017.

With respect to additional medical records and other evidence of record, I adopt Shields' recitation of facts set forth in her Statement of Uncontroverted Facts (ECF 20) and note that they are admitted in their entirety by the Commissioner (ECF 25-1). I also adopt the Commissioner's Statement of Additional Facts (ECF 25-2), which Shields does not dispute. These statements provide a fair and accurate description of the relevant record before the Court. Additional specific facts are discussed as needed to address the parties' arguments.

## Discussion

A.    Legal Standard

To be eligible for DIB and SSI under the Social Security Act, Shields must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.

2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner engages in a five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The first three steps involve a determination as to whether the claimant is currently engaged in substantial gainful activity; whether she has a severe impairment; and whether her severe impairment(s) meets or medically equals the severity of a listed impairment. At Step 4 of the process, the ALJ must assess the claimant's RFC – that is, the most the claimant is able to do despite her physical and mental limitations, *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) – and determine whether the claimant is able to perform her past

relevant work.  *Goff v. Barnhart,* 421 F.3d 785, 790 (8th Cir. 2005) (RFC

assessment occurs at fourth step of process).  If the claimant is unable to perform her

past work, the Commissioner continues to Step 5 and determines whether the

claimant can perform other work as it exists in significant numbers in the national

economy.  If so, the claimant is found not to be disabled, and disability benefits are

denied.

The claimant bears the burden through Step 4 of the analysis.  If she meets

this burden and shows that she is unable to perform her past relevant work, the

burden shifts to the Commissioner at Step 5 to produce evidence demonstrating that

the claimant has the RFC to perform other jobs in the national economy that exist in

significant numbers and are consistent with her impairments and vocational factors

such as age, education, and work experience.  *Phillips v. Astrue*, 671 F.3d 699, 702

(8th Cir. 2012).  If the claimant has nonexertional limitations, including those

caused by a severe mental impairment, the Commissioner may satisfy his burden at

Step 5 through the testimony of a vocational expert.  *King v. Astrue*, 564 F.3d 978,

980 (8th Cir. 2009).

I must affirm the Commissioner's decision if it is supported by substantial

evidence on the record as a whole.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402

U.S. 389, 401 (1971); *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010).

Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion. *Jones*, 619 F.3d at 968. Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

B.    The ALJ's Decision

The ALJ found that Shields met the requirements of the Social Security Act through June 30, 2017, and that she had not engaged in substantial gainful activity since September 1, 2013, the alleged onset date of disability; or since February 28, 2014, the date of the prior unfavorable decision. The ALJ found that Shields' spinal arthritis, asthma, neurogenic bladder, schizophrenia, depression, and anxiety were severe impairments, but that these impairments did not meet or medically equal a

listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22-23.)[3] The

ALJ found that Shields had the RFC to perform sedentary work except that she

> cannot climb ladders, ropes or scaffolds. He [sic] can occasionally
> climb ramps and stairs. He [sic] can engage in frequent stooping,
> crouching, crawling and can frequently engage in handling and
> fingering. The claimant cannot have concentrated exposure to extreme
> heat/cold, dust, fumes, or other pulmonary irritants. He [sic] is limited
> to performing simple, routine tasks but not at a fast pace such as
> assembly line. The claimant is limited to occasional interaction with
> the public.

(Tr. 24.)

The ALJ determined that Shields could not perform her past relevant work as

a nurse's aide. (Tr. 30.) Considering Shields' RFC and her age, education, and

work experience, the ALJ found vocational expert testimony to support a conclusion

that Shields could perform work as it exists in significant numbers in the national

economy, and specifically, as a document preparer, administrative support worker,

and final assembler-optical. The ALJ thus found that Shields was not under a

disability from February 28, 2014, through the date of the decision. (Tr. 31.)

C.    Opinion Evidence re Mental Impairments

The record before the ALJ contained treatment notes and medical source

statements from Shields' three mental health care providers who treated Shields

beginning in May 2015. The record also contained 1) a report from a consulting

---

[3] The ALJ also found that Shields' status post squamous cell carcinoma of the cervix and
pacemaker placement were non-severe. (Tr. 22.) Shields does not challenge this finding.

psychologist, who conducted a consultative psychological evaluation of Shields in April 2015 for disability determinations; and 2) a psychiatric review technique form (PRTF) completed May 13, 2015, by a state-agency, non-examining psychological consultant with disability determinations.

In her written decision, the ALJ accorded some weight to the opinions of the consulting psychologist and non-examining psychologist. As to Shields' three treating mental health care providers, PA Branum and Drs. Clarke and Owoso, the ALJ accorded partial weight to Dr. Clarke's opinion, little to partial weight to PA Branum's opinion, and little weight to Dr. Owoso's opinion. Shields argues that the ALJ erred in her treatment of this opinion evidence. For the following reasons, I agree.

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including her symptoms, diagnoses, and prognoses; what she can still do despite her impairments; and her physical and mental restrictions. 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) (2017).[4] The Regulations require that more weight be given to the opinions of treating sources than other sources. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating source's assessment of the nature and severity of a

---

[4] In March 2017, the Social Security Administration amended its regulations governing the evaluation of medical evidence. For evaluation of medical opinion evidence, the new rules apply to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1520c, 416.920c. Because the claims under review here were filed before March 27, 2017, I apply the rules set out in 20 C.F.R. §§ 404.1527 and 416.927.

claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating source has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When a treating source's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord that and any other medical opinion of record, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the source provides support for their findings, whether other evidence in the record is consistent with the source's findings, and the source's area of specialty. 20 C.F.R. §§ 404.1527(c), 416.927(c). Although a licensed PA is not considered an acceptable medical source on claims filed before March 27, 2017, *see* 20 C.F.R. §§ 404.1502(a)(8), 416.902(a)(8), the Commissioner must nevertheless apply the factors of §§ 404.1527(c) and 416.927(c) in weighing their opinion

evidence.  *See* 20 C.F.R. §§ 404.1527(f), 416.927(f).  The Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Against this backdrop, I turn to the ALJ's treatment of the opinion evidence of record here.

1.    State-Agency, Non-Examining Psychologist

On May 13, 2015, Marsha Toll, Psy.D., a psychological consultant for disability determinations, completed a PRTF in which she opined that Shields' affective and anxiety-related disorders caused mild restrictions in activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace; with no repeated episodes of decompensation of extended duration.  (Tr. 108-10.)  Dr. Toll opined that Shields' increased anxiety was related to her February 2015 surgery and that, with improvement in her physical condition and with taking medication, her psychiatric impairment would be non-severe within twelve months, and specifically, by January 2016.  (Tr. 109.)

In her written decision, the ALJ accorded "some weight" to Dr. Toll's opinion, reasoning only that Dr. Toll's finding that Shields' mental conditions were non-severe was "consistent with the evidence of record available at that time. However, evidence received at the hearing level suggests greater limitation."  (Tr.

29.)  The ALJ gave no other reason to accord any weight to this opinion.

When Dr. Toll rendered her opinion on May 13, 2015, the most recent medical evidence in the record was the report from a consultative examination, which was conducted in April 2015.  (*See* Tr. 102-07.)  But Shields did not begin receiving regular psychiatric treatment until May 7, 2015; and from that date to February 27, 2017, Shields visited her treating mental health care providers on no less than twelve separate occasions.  Dr. Toll did not have this evidence or any other evidence detailing the progression of Shields' mental impairments, including the auditory and visual hallucinations, the diagnosis of schizophrenia, and the psychiatric treatment received.  Dr. Toll therefore did not have the benefit of the observations of Shields' treating providers, who recorded the deteriorating nature of Shields' mental condition and the ineffectiveness of her medications.

It is well established that opinions of non-examining sources are generally given less weight than those of examining sources, *Willcockson v. Astrue,* 540 F.3d 878, 880 (8th Cir. 2008); and that when weighing the opinion of a non-examining source, the ALJ must evaluate the degree to which the source considered all of the pertinent evidence.  20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Here, the only observation the ALJ made regarding Dr. Toll's opinion – that Dr. Toll did not have evidence before her showing that Shields suffered greater limitations than as opined – constituted a reason *not* to accept the opinion.  The ALJ provided no reason to

accord Dr. Toll's opinion any weight at all, let alone "some" weight. Moreover, by according this opinion some weight while giving the opinions of Shields' treating sources only little to partial weight, the ALJ's treatment of this opinion evidence runs afoul of the general rule that opinions of non-examining sources are generally given <u>less</u> weight than those of examining sources.

The ALJ erred in according some weight to Dr. Toll's May 2015 opinion.

2.      Consulting Psychologist

The ALJ also erred in her treatment of the opinion rendered by Kirmach Natani, Ph.D., the consulting psychologist who conducted a one-time psychological evaluation of Shields for disability determinations.

Dr. Natani conducted this evaluation on April 16, 2015, and opined, *inter alia*, that Shields had a Global Assessment of Functioning (GAF) score of 60 related to anxiety and dysthymia. (Tr. 412.) According to the fourth edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), this score indicates that Shields experienced mild to moderate symptoms in social, occupational, and psychological functioning. *See* DSM-IV at 32-34.[5] In her written decision, the ALJ accorded "some weight" to this GAF score, reasoning that Shields and family members reported some problems and that "treatment notes document some ongoing symptoms but with essentially normal

---

[5] The fifth edition of the DSM, issued in May 2013, does not include the GAF scale.

mental status examinations[.]"  (Tr. 29.)

A factor to consider in determining the weight given opinion evidence is "the extent to which a medical source is familiar with the other information in [the claimant's] case record[.]"  20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6).  As with Dr. Toll, Dr. Natani did not have the benefit of substantial record evidence detailing the deterioration of Shields' mental impairments or the psychiatric treatment Shields received beginning in May 2015 and continuing into 2017.

In addition, the ALJ's statement that treatment records show "essentially normal" mental status examinations is belied by the record.  During Shields' visits with PA Branum in May and June 2015, mental status examinations showed Shields to have persistent thoughts of death, open weeping and sobbing, a poor and dysthymic affect, consistent bad or "not good" moods, and perseveration on ideas of loss.[6]  In June 2015, mental status examinations showed that Shields began experiencing auditory hallucinations.  Her prognosis during that time was poor.[7] While one mental status examination in August 2015 showed improvement,[8] several examinations from December 2015 through March 2016 showed a significant worsening of symptoms:  thoughts of hurting others, auditory and visual hallucinations, possible thought insertion, sad mood, blunted/flat affect, problems with attention and concentration, slow speech, dysthymia, poor insight, suicidal

---

[6] (Tr. 491, 494, 497-98, 501, 504.)
[7] (Tr. 491, 494, 498.)
[8] (Tr. 488-89.)

- 14 -

ideation, and more.[9]  During this period, Shields' prognosis continued to be poor.

Mental status examination in October 2016 showed continued auditory and visual

hallucinations that Shields sometimes acted upon, bad mood, blunted affect, and

evident negativism.[10]  A November 2016 mental status examination showed

increased visual hallucinations, a more anxious mood, and blunted affect.[11]  And a

February 2017 mental status examination showed continued auditory and visual

hallucinations, worsening mood, and a restricted and dysthymic affect.[12]  While

there were also intermittent observations of improved concentration, memory,

insight, and judgment, in view of the significant symptoms described above that

were consistent throughout Shields' treatment, it cannot be said that Shields' mental

status examinations were "essentially normal."  This discrepancy between the ALJ's

finding and the actual evidence of record undermines the ALJ's ultimate conclusion

of non-disability.  *See Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).

Given that the ALJ's erroneous finding of "essentially normal" mental status

examinations provided the basis to accord some weight to Dr. Natani's GAF opinion

that Shields experienced only mild to moderate symptoms, it cannot be said that the

ALJ properly considered this opinion evidence or that the weight given to it is

supported by substantial evidence on the record as a whole.

---

[9] (Tr. 476, 479-80, 482-83, 485-86.)
[10] (Tr. 473-74.)
[11] (Tr. 469.)
[12] (Tr. 465.)

3.     Treating Sources

From May 2015 through at least February 2017, Shields received psychiatric treatment from three mental health care providers at Washington University Cancer Psychiatry Clinic. From May through August 2015, she treated with Faye Branum, MPAS, PA-C. Thereafter, through March 2016, she treated with Marty Clarke, PA-C, Ph.D, with consultation from psychiatrist Akinkunle Owoso, M.D. From October 2016 through February 2017, Shields treated with Dr. Owoso. Each of these mental health care providers completed a Medical Source Statement (MSS) of Ability to Do Work-Related Activities (Mental). (Tr. 415-18, 420-23, 454-57.)

In their respective MSS, each provider opined that Shields had a fair ability to follow work rules and to interact with supervisors. They also each opined that Shields had poor or no ability to deal with the public, deal with work stresses, or maintain attention or concentration; and had fair or poor to no ability to relate to co-workers, use judgment, and function independently. To support her opined assessment, PA Branum explained:

> [Patient] has developed severe depression [with] poor concentration and panic attacks that [first] started when the [patient] was in her early teens and went untreated for a number of [years]. At present her symptoms are still poorly controlled and marked by anhedonia, crying spells, poor sleep and appetite [with] weight loss and very poor concentration and lapses in memory which are apparent and affect activities of daily living considerably.

(Tr. 416.) Dr. Clarke explained his assessment as follows:

She was initially diagnosed with severe major depression. Over the following months, multiple combinations of antidepressant and antipsychotic medications failed to provide meaningful benefit. I first saw her and took over her care in the same clinic on December 16, 2015 and agree with the diagnosis of severe major depression. In addition, I added a diagnosis of Schizophrenia. This is based on a history of auditory and visual hallucinations associated with increasingly frequent and severe paranoid delusions predating her depression. She is currently unable to function in social or work settings. Given the severity of her symptoms and poor response to numerous medications her prognosis for future employment is guarded.

(Tr. 424.) Finally, Dr. Owoso explained:

The patient has symptoms of psychosis that are consistent with schizophrenia. The patient experiences auditory and visual hallucinations along with negativism in the form of affective flattening and depressive symptoms. The patient's concentration is significantly affected as well – all of which lead to significant vocational limitations. These are part of the cognitive symptoms of her illness.

(Tr. 455.) Dr. Owoso also provided explanations for other opined limitations – and specifically that Shields had poor or no ability to understand, remember, and carry out simple, detailed , or complex job instructions and had poor or no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability:

The patient's presentation of schizophrenia is associated with positive, negative, and cognitive symptoms as outlined above. These cognitive symptoms (limitations in concentration and memory, concrete thought content) lead to significant limitations in vocational performance context.
. . .
The patient's paranoia along with consequent anxiety render social reliability difficult.

(Tr. 455-56.)

The ALJ accorded partial weight to that portion of PA Branum's MSS that opined that Shields had a fair ability to understand, remember and carry out simple tasks, follow work rules, relate to co-workers, and interact with supervisors. (Tr. 28, 415-16.) The ALJ accorded little weight to that part of the MSS, however, that opined that Shields had poor or no ability to deal with the public, use judgment, deal with work stress, function independently, and maintain attention and concentration. (Tr. 28-29, 415.) The ALJ reasoned that these latter opinions were "extreme when compared to treatment notes and the claimant's admitted activities and abilities." (Tr. 29.) As to the opinions expressed in Dr. Clarke's MSS, the ALJ accorded them only partial weight because they were expressed on "a pre-printed form questionnaire submitted to him by the claimant's attorney, that includes a number of leading questions and similar inducements. The form is not designed for objectivity, but rather for verification of some preconceived suggested conclusions about the claimant's allegedly diminished health and fitness." (*Id.*) Finally, the ALJ accorded little weight to Dr. Owoso's MSS, reasoning only that his opinions were "extreme and inconsistent with treatment notes that suggest at most moderate symptoms." (*Id.*)

For the following reasons, the ALJ's explanations for according little to partial weight to these treating sources' opinions are not supported by the record.

a.      *Treatment Notes*

In May 2015, and continuing throughout her treatment, Shields was diagnosed with major depression (moderate to severe) and panic disorder.  She was prescribed several psychotropic medications – including Zoloft, Zyprexa, Ativan, and Trazodone – which did not improve her symptoms.  Treatment notes show that she began reporting auditory hallucinations in June 2015 and began thinking that life would be easier for her loved ones if she was gone.  (Tr. 496.)  In December 2015, she began reporting anxiety and worry regarding her safety and had daily thoughts of hurting herself or others.  She reported having auditory and visual hallucinations and told Dr. Clarke that she wanted to get away from the voices and the people in her house.  She displayed several symptoms of negativism.[13]  She had problems remembering the days of the week and the months of the year.  She was diagnosed with schizophrenia.  Olanzapine and haloperidol were prescribed, with a plan to cross-taper these medications with her other medications so that all of her mental impairments could be appropriately treated.  (Tr. 484-86.)

Treatment notes show that Shields reported to Dr. Clarke in January 2016 that the voices were telling her to hurt herself or others.  Although her thought processes had improved, she had poor memory and decreased concentration.  She had no

---

[13] Acute symptoms of schizophrenia include hallucinations, delusions, thought disorder, loose associations, ambivalence, and affective lability.  Symptoms of "negativism" associated with schizophrenia are those that follow from diminished volition and executive function, including inertia, lack of involvement with the environment, poverty of thought, social withdrawal, and blunted affect.  *Stedman's Medical Dictionary* 1885 (27th ed. 2000).

motivation.  Dr. Clarke noted that Shields' symptoms were stable to worse.  (Tr. 481-83.)  In March 2016, Shields reported being scared of the visual hallucinations and that she stayed in her bedroom.  She had daily panic attacks.  The voices no longer told her to hurt herself, but she did not feel safe – she believed that someone was going to harm her.  She was ready to give up.  Treatment notes show that Shields's current medications did not improve her condition, so risperidone and klonopin were added to her treatment regimen.  Her symptoms worsened, however.  Treatment notes show that within weeks, Shields became more anxious and scared.  She continued to feel unsafe around other people, and the frequency of panic attacks increased.  (Tr. 475-80.)  As described in Dr. Owoso's treatment notes from the fall of 2016, another adjustment to medication did not improve her symptoms.  Dr. Owoso continued to treat Shields on an outpatient basis because she had no dangerous ideation either toward herself or others, but she nevertheless experienced increased anxiety and increased visual hallucinations.  (Tr. 469-74.)  Treatment notes show that in February 2017, Dr. Owoso observed that Shields enjoyed no longstanding improvement of her symptoms.  Once again, her medications were adjusted.  (Tr. 464-66.)

Contrary to the ALJ's finding, neither PA Branum's nor Dr. Owoso's opined limitations of Shields' ability to perform work-related functions were "extreme" when compared to the observations and findings documented in the several

treatment notes made not only by them as Shields' treating mental health care providers but also by Dr. Clarke, another treating mental health care provider. Nor can it be said that experiencing daily panic attacks, daily hallucinations, and avoidance of people because of a fear of being harmed are "moderate" symptoms or that such symptoms are inconsistent with the opined limitations.

Because PA Branum's and Dr. Owoso's opinions were consistent with the treatment notes of record and did not describe "extreme" limitations when compared with such notes, the ALJ's reason to discount their opinions is not supported by the record. *Frederick v. Berryhill*, 247 F. Supp. 3d 1014, 1032 (E.D. Mo. 2017).

b. *Checklist Nature of MSS*

An MSS is a checklist evaluation in which the responding physician ranks the claimant's abilities. *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). It is considered a source of objective medical evidence. *Id.*; *Burress v. Apfel,* 141 F.3d 875, 879 (8th Cir. 1998). Although an ALJ may on a personal level consider this checklist method of evaluation deficient, she must provide a "principled reason" to reject it. *Reed*, 399 F.3d at 921. Accordingly, an ALJ cannot find opinions expressed in an MSS deficient *ipso facto* merely because the evaluation is in a checklist format. *Id.* She may, however, discount a checklist MSS if it contains only conclusory opinions, cites no medical evidence, and/or provides little to no elaboration. *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (citing *Wildman*

*v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)).

Here, the ALJ discounted Dr. Clarke's "pre-printed form questionnaire" reasoning that it was supplied by Shields' attorney and included a number of "leading questions and similar inducements" designed for verification of "some preconceived suggested conclusions about the claimant's allegedly diminished health and fitness." (Tr. 29.) The ALJ does not explain the basis for these characterizations. Indeed, the ALJ's statement about the suggestive nature of this form is troubling, given that it is basically the same as the pre-printed MSS form approved by the Social Security Administration and provided by the Office of Disability Adjudication and Review, which seeks the same information and in the same format. Further, there is no evidence to support the ALJ's suggestion that the MSS completed by Dr. Clarke did not reflect his independent medical opinion merely because the form was provided by counsel. *See Upchurch ex rel. Q.T. v. Astrue*, No. 4:07CV749 CDP, 2008 WL 4104537, at *13-14 (E.D. Mo. Aug. 29, 2008). In fact, with Dr. Clarke's citation to medical evidence supporting his opinions and his elaborate explanation for his conclusions, the contrary is true.

Accordingly, the ALJ's stated reasons to discount Dr. Clarke's MSS are not supported by substantial evidence.

c.    *Admitted Activities and Abilities*

Throughout her written decision, the ALJ cited to Shields' hearing testimony

and Function Report to support her findings that Shields "admittedly gets along with friends and family members and leaves home on a regular basis" (Tr. 23); "admittedly is able to care for herself, care for her 10-year old daughter, prepare simple meals, perform simple household chores, shop in stores, manage finances, use public transportation, and watch television" (Tr. 23-24); and "admittedly is able to perform basic hygiene and grooming, prepare simple meals, and perform simple household chores" (Tr. 24). The ALJ also stated that Shields "testified to regular daily activities" and that, while Shields testified that she sometimes isolated herself in her bedroom and did not shower, "she did not quantify this testimony." (Tr. 28.) According to the ALJ, some of PA Branum's opinions expressed in her MSS were "extreme" when compared to these "admitted activities and abilities." She therefore accorded little weight to those opinions. (Tr. 28-29.)

The Function Report upon which the ALJ relied to make her findings as to Shields' "admitted activities and abilities" was completed in October 2014 – seven months before the exacerbation of Shields' depressive symptoms, eight months before she manifested schizophrenic symptoms, fourteen months before her initial diagnosis of schizophrenia and treatment therefor, and over two and a half years before the administrative hearing. Because an ALJ must determine a claimant's abilities as they exist at the time of the hearing, the ALJ erred here when she relied on remote evidence to determine Shields' abilities. *Frankl v. Shalala*, 47 F.3d 935,

939 (8th Cir. 1995). *See also Morse v. Shalala*, 32 F.3d 1228, 1230-31 (8th Cir. 1994) (ALJ erred by relying on old medical report and gave no weight to subsequent supporting evidence, including treating physician's progress notes).

Most troubling, however, is the ALJ's purported reliance on Shields' hearing testimony to support her findings of Shields' abilities and activities. I have read and reread the transcript of Shields' hearing testimony and, contrary to the ALJ's findings, nowhere did Shields testify that she could care for her 10-year-old daughter[14]; nowhere did she testify to regular daily activities; nowhere did she testify that she shops in stores or uses public transportation; nowhere did she testify that she leaves home on a regular basis. (*See* Tr. 45-53.) To the extent the ALJ correctly found that Shields testified to sometimes isolating herself in her bedroom and not showering, the ALJ erroneously stated that Shields did not "quantify" this testimony. (Tr. 28.) To the contrary, Shields testified that in a thirty-day period, her depression causes her to isolate herself "[a]bout half of the time." (Tr. 52.) Again, the ALJ's erroneous characterization of record evidence casts doubt on her ultimate conclusion of non-disability. *See Baumgarten*, 75 F.3d at 369.

Accordingly, the reason given to accord little weight to certain opinions in PA Branum's MSS is not supported by substantial evidence on the record as a whole.

---

[14] In fact, Shields testified that her 10-year-old daughter takes "more care" of her than Shields does of her daughter. (Tr. 53.)

## Conclusion

For the reasons stated above, the ALJ failed to properly weigh the opinion evidence of record regarding Shields' mental impairments and thus failed to properly consider Shields' claim of disability. The finding that Shields is not disabled is therefore not supported by substantial evidence on the record as a whole. *See Tilley v. Astrue*, 580 F.3d 675, 681-82 (8th Cir. 2009). The Commissioner's decision is therefore reversed and remanded for an appropriate analysis of the medical opinion evidence. In the event the Commissioner determines upon remand that the combination of Shields' severe and non-severe impairments renders her disabled, the opinion of a medical advisor may be helpful to determine the onset date of disability. *See Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir. 1997); SSR 83–20, 1983 WL 31249 (Soc. Sec. Admin. 1983).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 5th day of September, 2019.